[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The instant presentment arises out of the representation by the Respondent of one Mia Griffin in connection with a Massachusetts motor vehicle accident that occurred in 1989.[1] It is undisputed that the Respondent failed to bring an action against the alleged tortfeasor within the statute of limitations. Griffin brought a complaint against the Respondent to the local grievance panel, and that complaint, and the events that surrounded and followed it, form the basis of the instant presentment.
Based on the parties' "Partial Stipulation as to Facts," the court finds as follows:
Irving J. Pinsky, Juris #101271, was duly admitted to the bar of the State of Connecticut on May 19, 1981. In 1989, he was retained to represent Mia Griffin, then a minor, in a claim for personal injuries sustained in a motor vehicle accident in Massachusetts. Periodically, thereafter, he provided financial assistance to Griffin during his representation as an advance against the future proceeds from the personal injury action.
The Respondent initially pursued the personal injury claim for Griffin and received a settlement offer from the tortfeasor's insurance company, but he never communicated that offer to her. He did not commence a lawsuit within the applicable statute of limitations, and he did not tell his client about either the existence of the statute of limitations or his failure to commence a timely action on her behalf. On September 16, 1994, after the statute had run and in an effort to avoid any liability to Griffin, the Respondent persuaded her to sign a release in his favor for $4,000.00. Griffin was not represented in the transaction, nor did the Respondent never advise her to seek legal counsel prior to signing the release.
On September 11, 1995, Griffin filed a grievance complaint against the Respondent (Grievance Complaint #95-0215, Griffin v. Pinsky). Thereafter, on December 22, 1995, the Respondent met Griffin and gave her money in exchange for a statement to be provided to the local grievance panel investigating the complaint to the effect that she no longer had any complaint about him.
The Respondent acknowledges that he violated Rules 1.3 and 3.2 of the Rules of Professional Conduct by failing diligently and expeditiously to commence a lawsuit on Griffin's behalf within the applicable statute of limitations. He also acknowledges that he violated Rule 1.8(e) and (j) CT Page 15941-o of the Rules of Professional Conduct by providing financial assistance to Griffin during the course of his representation of her and in connection with the contemplated litigation, with the expectation that the loans would be paid back from the proceeds of her personal injury claim. The Respondent further admits that he violated Rules 1.8(h) and 8.4(4) of the Rules of Professional Conduct by obtaining a release from Griffin to absolve himself of malpractice liability when she was not independently represented and that he did not advise her to seek independent counsel with respect to the release. Finally, the Respondent acknowledges that he violated Rule 8.4(4) of the Rules of Professional Conduct by paying Griffin to prepare the December 22, 1995 statement in which she stated that she had no complaint with him in connection with the pending grievance.
The above-referenced written stipulation resolved most of the facts alleged within the Petition, with two exceptions. First, the Respondent denied that he had failed to communicate properly with Griffin, based on his contention that it was she who failed to notify him of her various changes of address and telephone number during the course of his representation. Second, the Respondent denied that his conduct with regard to the release he had Griffin sign, absolving him of any liability with regard to her case, violated Rule 8.4(3) of the Rules of Professional Conduct.[2]
At the August 7 hearing, the undersigned heard testimony regarding the nature of the communications between the Respondent and Griffin. Based on that testimony, the court finds that the Respondent was retained to represent Griffin in a personal injury matter arising from a Massachusetts accident that occurred in 1989. When the Complainant returned to Connecticut, she lived at 132 DeKalb Avenue in Bridgeport and informed the Respondent of this address. She then moved to 1193 Pembroke Street, Bridgeport, and informed the Respondent of her change of address. She then moved to 492 Putnam Street, Bridgeport, again notifying the Respondent, and remained at address for approximately three years, from 1992 to 1995, before moving back to a different address on Pembroke Street. At the time Griffin filed her underlying grievance against the Respondent in 1995, effectively ending his representation of her, she still resided at Putnam Street. Over the course of this six year representation, the Complainant lived at three different addresses and notified the Respondent of each change.
Griffin had provided the Respondent with phone numbers for her various addresses, and he had provided her with a beeper, which he used to contact her. The Respondent was free to contact her through her father, CT Page 15941-p who had originally hired the Respondent to represent her, and the Respondent visited her at her home at least three times during the course of his representation. There was thus clear and convincing evidence that the Respondent knew of her whereabouts, or, with minimal effort, could have known about her whereabouts, during his representation of her. He had adequate means to communicate with her during the few times that she moved, but he failed to do so and eventually lost the opportunity to resolve her case as the result of the expiration of the statute of limitations.
Although her residence was hardly static throughout the period of Respondent's representation of her, the court finds by clear and convincing evidence that she kept him reasonably informed of her changes of address and telephone number. While it might have required more than the ordinary amount of effort for the Respondent to have kept in contact with this client, he did not make diligent efforts to do so. His claim that he believed that the complainant had some unspecified personal problem with her father, even if accurate, did not justify his failure at least to try to reach her through him. The father had accompanied Griffin on several visits to the Respondent, and even if the father-daughter relationship had in some way become strained, there is no reason why the Respondent, had he truly wanted to reach his client, could not have asked the father to provide her present address and phone number. Because the Respondent claimed to have lost Griffin's case file, there was no way to confirm or refute her claims that she had notified him of her address changes by a review of that file.
The court thus concludes that the Respondent violated Rule 1.4(a) and (b) of the Rules of Professional Conduct. The court wishes to stress, however, that this issue among the least significant of the Respondent's transgressions in this case. His failure to communicate, while a serious matter, would not alone support the imposition of any form discipline that curtailed the Respondent's right to practice law.
The court admitted a September 16, 1994 document bearing Griffin's signature as an exhibit in this case. That document provided that in exchange for the sum of $4,000.00, she would release the Respondent and his firm from:
 Any matter from the auto collision of Jan/21/89 in Mass. + any matters from legal representation or misrepresentation from that time to now. I have spoken with other attorneys and the Statewide Grievance Committee and have seen my file + been CT Page 15941-q satisfied before in payments made to me. No admission of liability has been made by Attorney Pinsky but I have spoken to other lawyers and am happy with the settlement share received copy of agreement and I am not taking this under duress.
Griffin testified without contradiction that the quoted language was not filled in on the release at the time that she signed it. The Respondent has admitted that this release violated Rules 1.8(h) and 8.4(4) of the Rules of Professional Conduct. The only issue is whether the release also violated Rule 8.4(3) of the Rules of Professional Conduct, which prohibits "conduct involving dishonesty, fraud, deceit or misrepresentation." The Petitioner's position is that it is dishonest for a lawyer to obtain a release from his client in an attempt to absolve himself from all liability, including any potential liability for ethical misconduct. The Respondent's position is that he has more than adequately compensated Griffin for her troubles, and the release is nothing more than an effort to memorialize that fact.
Additionally, although not specifically so alleged by the Petitioner, the release appears to constitute a violation of at least the spirit of Rule 8.3(a), which prohibits conditioning a "settlement of a civil dispute involving allegations of improprieties on the part of a lawyer on an agreement that the subject misconduct not be reported to the appropriate disciplinary authority." Although the release does not specifically obligate Griffin not to report the alleged misconduct, it references her contacts with Petitioner and at least implies that the settlement of any civil claim against the Respondent should be deemed a resolution of any potential grievance against him. The Respondent has argued in his brief that he has paid the complainant a sum far in excess of the true value of her underlying case, such that she "makes out like a bandit." (Respondent's Brief, p. 9). Rather than exonerating him from the charge of dishonesty and deceit, however, this claim helps to establish that allegation, as the clear implication of the Respondent's overcompensating his former client is that he was trying to convince her to pursue her complaints against him no further. The court therefore finds by clear and convincing evidence that the Respondent violated Rule 8.4(3).
At the hearing in this matter, the parties revealed that the Respondent had recently paid an additional $5,000.00 to the Complainant in an effort to make "restitution." Although the ABA Standards recognize a "timely good faith effort to make restitution or to rectify consequences of misconduct" as a mitigating factor, the court is hard-pressed to conclude CT Page 15941-r that this payment was timely, and it appears more as an effort, at best, to try to impress the court and, at worst, to convince the complainant not to press the issue, rather than as a good faith attempt to make the victim whole. Indeed, as described by the Respondent, Griffin's underlying case appears to have had a full value of far less than the payments she has received from her former counsel, adding to the perception that the payments he made were undertaken less as an effort to right a wrong he had done to her and more as an attempt to try to avoid the disciplinary consequences of his ethical lapses.
The court is mindful of the fact that a "presentment proceeding is neither a civil action nor a criminal proceeding, but is a proceeding sui generis, the object of which is not the punishment of the offender, but the protection of the court." Statewide Grievance Committee v. Rozbicki,219 Conn. 473, 483 (1991), cert. denied, 502 U.S. 1094, 112 S.Ct. 1170,117 L.Ed.2d 416 (1992).
"`An attorney as an officer of the court in the administration of justice, is continually accountable to it for the manner in which he exercises the privilege which has been accorded him. His admission is upon the implied condition that his continued enjoyment of the right conferred is dependent upon his remaining a fit and safe person to exercise it, so that when he, by misconduct in any capacity, discloses that he has become or is an unfit or unsafe person to be entrusted with the responsibilities and obligations of an attorney, his right to continue in the enjoyment of his professional privilege may and ought to be declared forfeited. . . . Therefore, [i]f a court disciplines an attorney, it does so not to mete out punishment to an offender, but [so] that the administration of justice may be safeguarded and the courts and the public protected from the misconduct or unfitness of those who are licensed to perform the important functions of the legal profession.'"Doe v. Statewide Grievance Committee, 240 Conn. 671, 684-85, 694 A.2d 1218
(1997), quoting Massameno v. Statewide Grievance Committee, 234 Conn. 539,554-55, 663 A.2d 317 (1995).
While they have not been officially adopted as rules by the Judges of the Superior Court, the American Bar Association's Standards for Imposing Lawyer Sanctions have frequently been utilized in determining the appropriate discipline to be imposed in presentment matters. Our Supreme Court has noted their usefulness in Statewide Grievance Committee v.Spirer, 247 Conn. 762, 782, 725 A.2d 948 (1999); see also StatewideGrievance Committee v. Shluger, 230 Conn. 668, 673 n. 10, 646 A.2d 781
(1994). Section 3.0 of the Standards states that "[i]n imposing a sanction after a finding of lawyer misconduct, a court should consider the following factors: (a) the duty violated; (b) the lawyer's mental CT Page 15941-s state; (c) the potential or actual injury caused by the lawyer's misconduct; and (d) the existence of aggravating or mitigating factors."
Here, the respondent violated his duty to communicate with his client in several respects as well as his duty to protect her rights by diligently and expeditiously commencing a lawsuit within the statute of limitations. He violated his duty to his client to remain free of conflicts of interest by providing her with financial assistance and thereby acquiring a proprietary interest in her share of the proceeds of her case. He violated his duty to the court and to his client by seeking to resolve any claims of malpractice by having his client execute a release without counsel and without benefit of his advice to seek counsel before signing. He engaged in conduct prejudicial to the administration of justice by seeking to thwart Griffin's pursuit of a grievance against him, and the court finds that in doing so, he engaged in conduct involving dishonesty, deceit and misrepresentation.
As for the respondent's mental state, no evidence has been introduced that suggests that this should be a relevant factor one way or the other in arriving at a disposition.
The respondent claims that because Ms Griffin eventually received a sum far in excess of the possible full value of her case, had he properly pursued it, there has been no injury or potential injury that the court need consider as relevant to the disposition in his case. Even had she been able to pursue a malpractice case against him, he argues, no court would have awarded more than she sum he had already paid her. In making this argument, he completely misses the point. First, although his payments may have prevented any actual injury to Griffin, the creation of a potential for injury can hardly be denied. More importantly, although he has succeeded in making Griffin whole. . . perhaps even more than whole . . . as the result of his payments to her, the injuries he has inflicted are primarily upon the system of justice in its entirety, not just an individual client. Griffin's right to diligence, communication and conflict-free representation on the part of her attorney have more than monetary value, but it is the respondent's efforts to subvert her efforts to hold him accountable for his misconduct that have caused serious potential injury to the administration of justice.
Section 9.1 of the ABA Standards states that "[a]fter misconduct has been established, aggravating and mitigating circumstances may be considered in deciding what sanction to impose." The § 9.22 aggravating factors include: (a) prior disciplinary offenses; (b) dishonest or selfish motive; (c) a pattern of misconduct; (d) multiple offenses; (e) bad faith obstruction of the disciplinary proceeding by CT Page 15941-t intentionally failing to comply with rules or orders of the disciplinary agency; (f) submission of false evidence, false statements, or other deceptive practices during the disciplinary process; (g) refusal to acknowledge wrongful nature of conduct; (h) vulnerability of victim; (i) substantial experience in the practice of law; (j) indifference to making restitution; (k) illegal conduct, including that involving the use of controlled substances.
The § 9.32 mitigating factors include: (a) absence of a prior disciplinary record; (b) absence of a dishonest or selfish motive; (c) personal or emotional problems; (d) timely good faith effort to make restitution or to rectify consequences of misconduct; (e) full and free disclosure to disciplinary board or cooperative attitude toward proceedings; (f) inexperience in the practice of law; (g) character or reputation; (h) physical disability; (i) mental disability or chemical dependency including alcoholism or drug abuse when: (1) there is medical evidence that the respondent is affected by a chemical dependency or mental disability; (2) the chemical dependency or mental disability caused the misconduct; (3) the respondent's recovery from the chemical dependency or mental disability is demonstrated by a meaningful and sustained period of a successful rehabilitation; and (4) the recovery arrested the misconduct and recurrence of that misconduct is unlikely; (j) delay in disciplinary proceedings; (k) imposition of other penalties or sanctions; (l) remorse; (in) remoteness of prior offenses.
Certain features of this Presentment appear to constitute aggravating circumstances as defined by the American Bar Association. Most significantly, the court concludes that respondent's preparation of the September 16, 1994 release in an attempt to relieve himself of liability and possible disciplinary action indicates a dishonest and selfish motive in that its primary intent was to prevent his client from suing him for malpractice and/or filing a grievance complaint against him. Second, Griffin was a minor at the commencement of the representation and was financially destitute throughout, rendering her extremely vulnerable. Finally, as an attorney who has been practicing for twenty years, the Respondent has had substantial experience in the practice of law and ought to have known better.
Mitigating factors include the absence of prior disciplinary action against the Respondent. Additionally, in light of the long delay in prosecuting these disciplinary proceedings, which delay can not be attributed to the Respondent, the court also views as mitigating the fact that most of the events relevant to the disposition in this case occurred many years ago, and there has been no indication of further CT Page 15941-u transgressions in the interim. Under the circumstances previously outlined, the court does not regard the Respondent's effort to make "restitution" as a significant mitigating factor in this case.
The ABA Standards indicate that a suspension is appropriate when "a lawyer knowingly fails to perform services for a client and causes injury or potential injury to a client." (Section 4.42) Suspension is even more appropriate when, as here, the lawyer's conduct includes efforts to obstruct the orderly administration of justice by seeking to subvert the grievance process. The Standards also indicate that "[g]enerally, suspension should be for a period of time equal to or greater than six months, . . ." (Section 2.3). The commentary to that section notes that suspensions for less than that time "are not an effective means of protecting the public."
Citing the various aggravating factors previously mentioned, the Petitioner has recommended a suspension of one year from the practice of law with the requirement that the Respondent be required to take and pass the Multistate Professional Responsibility Examination (MPRE) and to take and complete one continuing legal education class in professional responsibility prior to his automatic reinstatement. The Respondent urges the court to impose only a reprimand. This court agrees with the Petitioner that the Respondent's course of conduct warrants suspension. Indeed, were it not for the fact that the events of this case occurred so long ago, the court would be considering a suspension for longer than one year.
Having concluded that the Respondent should be suspended, the court turns attention to certain "unauthorized practice of law" issues that the parties have asked the court to address in the event of a suspension. The Respondent's law firm is in his name only ("Law Offices of Irving J. Pinsky"), although he has other attorneys presently working for him. The Respondent's firm also has an "800" number, "1-800-LAWYERS". Both parties agree that the Respondent is a well-known, visible personality in the New Haven community. He regularly appears on the radio and hosts his own local access cable television program.
For all of these reasons, the Petitioner seeks the entry of certain orders designed to eliminate the possibility that the Respondent will engage in the unauthorized practice of law during the period of his suspension. Although requesting different orders, the Respondent has also asked for rulings on these issues in. the event of a suspension so that he will know what he may and may not do. Specifically, the Petitioner seeks orders barring the Respondent from allowing the firm to practice law in the name of "Law Offices of Irving J. Pinsky" and that the CT Page 15941-v Respondent's stationery or letterhead be changed so there is no suggestion that the Respondent is entitled to practice law during his suspension. The Petitioner suggests that the Court order the Respondent's office to answer the phone as "Law Offices" or "Law Offices of — (the new firm name)", and if anyone inquires about the Respondent, he or she should be informed that the Respondent is currently serving a suspension and will be reinstated after the date that the Court orders the Respondent's suspension to be completed. The Petitioner recommends that the court enjoin the Respondent from professionally appearing on radio, television or other electronic media, including the internet, during the course of his suspension. The Respondent essentially recommends the opposite of what the petitioner is seeking.
The Petitioner acknowledges there is no existing Connecticut case law that supports the entry of such orders ancillary to a suspension of the right to practice. The court itself is concerned that much of what the Petitioner seeks would amount to prior restraint on the Respondent's free speech rights. The Respondent claims, however, that unless the court enters orders one way or the other, he will be left to rely on his own instincts or the advice of others, "inevitably result[ing] in an unauthorized practice charge." He cites Utah State Bar v. Summerhayes andHayden, 905 P.2d 867 (1995) for the proposition that what constitutes the unauthorized practice of law requires a case by case decision and that each case must therefore be individually evaluated to determine whether particular acts violate the terms of a suspension of practice. He cites no authority, however, for the proposition that the suspending court must give him a road map telling him in advance which forms of conduct will be acceptable and which will not.
In determining whether particular conduct constitutes the practice of law:
 the decisive question is whether the acts performed [are] such as are commonly understood to be the practice of law. Attempts to define the practice of law have not been particularly successful. The reason for this the broad field covered. The more practical approach is to consider each state of facts and determine whether it falls within the fair intendment of the term.
(Internal quotation marks omitted) (Citations omitted), StatewideGrievance Committee v. Patton, 239 Conn. 251, 255 (1996). There is no reason to conclude that Patton should be viewed as encouraging judges to CT Page 15941-w try to decide these difficult questions in a vacuum. If the respondent conducts himself in a manner that the Petitioner believes constitutes the practice of law, the court is confident that the Petitioner will bring the matter to the court's attention in the proper manner.
It is inescapable, however, that what the parties are seeking to do now is to have the court enter an advisory opinion with respect to a variety of issues that may or may not eventually produce a case or controversy. It should be obvious enough that to hold oneself out to the public as "The Law Offices of (A Lawyer Suspended from the Practice of Law)" is antithetical to the concept of a lawyer who has been suspended. Beyond the obvious, however, the court does not believe that as part of its order, it should advise the Respondent prospectively about how his staff should answer his telephone, what they may or should include on their letterhead or shingle in order to explain his status, whether he may appear on radio or on television, and if so, what he may and may not say. The court simply orders that the Respondent be suspended from the practice of law in the State of Connecticut. As is required by the Federal Rules, he is obligated to notify the Federal District Court of this suspension promptly so that it may take whatever action it believes is appropriate with regard to his right to practice in the Federal Court.
For all of the above reasons, the Respondent is suspended from the practice of law for a period of one year, effective January 1, 2002. The Respondent is further ordered to take and pass the Multistate Professional Responsibility Examination (MPRE) and to take and complete one continuing legal education class in professional responsibility prior to his reinstatement. Attorney Jonathan Einhorn is appointed to assure that the interests of the Respondent's clients are adequately protected. Because it has been made clear to the court that one or more attorneys are currently employed by the Respondent, the court does not at this time see any need to appoint an attorney to safeguard the Respondent's interests, although it would reconsider this issue on the request of either party.
Jonathan E. Silbert, Judge